FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

NOV 18 AM 10: 09

U.S. DISTRICT COURT
N.D. OF ALABAMA

MELISHA E. HEARD,               )
                                )
        Plaintiff,              )
                                )
    vs.                         )        CV 98-PT-2541-E
                                )
TYSON FOODS, INC.,              )
                                )
        Defendant.              )
                                )
                                )

ENTERED

NOV 18 1999

### MEMORANDUM OPINION

This cause comes on to be heard on Defendant Tyson Foods, Inc.'s Motion For

Reconsideration and Request for Oral Argument  filed on October 6, 1999.

After oral argument and a more studied review of the evidentiary submissions, the court

has concluded that defendant's motion for summary judgment is due to be granted.  The court

has particularly considered the plaintiff's deposition taken on March 7, 1999.  The court has

further read the case of Combs v. Plantation Patterns, 106 F.2d 1519 (11th Cir. 1997).  The court

has also considered the recent cases of Contu v. Martin County Bd, etc., 47 F.3d 1068 (11th Cir.

1995); Jones v. Carraway Med. Ctr., 151 F.3d 1306 (11th Cir. 1998); partially superseded at 151

F.3d 1321 (11th Cir. 1998); and Holyfield v. Reno, 115 F.2d 1555 (11th Cir. 1997).  In this court's

earlier consideration, it may have placed too much emphasis on the fact that there appeared to be

some factual disputes.  As to some articulated non-

-1-

discriminatory reasons, there is no dispute.  These include matters relating to spoilage of
products, failure to respond to supervisors, shipping sequences, etc.

Further, it appears that, although in her EEOC charge plaintiff attributed her difficulties
to Sanders, the evidence reflects that she had problems with other supervisors and only one
significant problem with Sanders himself; that is when she failed to properly be available for
Saturday work.

The court is attaching hereto excerpts from plaintiff' deposition which reveal that there
were at least several non-discriminatory reasons for terminating plaintiff's employment.

### Court's Legal Conclusions On Race Discrimination Claim

The court starts with the assumption that plaintiff has presented sufficient evidence to
establish a prima facie case.  This is based upon a determination that (1) plaintiff is black, (2) she
was terminated, (3) she was at least minimally qualified for the job, and (4) the job was given to a
white.

It is clear, however, that the defendant has articulated legitimate, non-discriminatory
reason(s) for its actions.  Plaintiff, thus, is required to demonstrate that the stated reason(s) were
pretextual.  Three recent Eleventh Circuit cases throw light on the standards the court must apply
in evaluating plaintiff's evidence

In Bogle v. Orange County Bd. of City Com'rs., 162 F.3d 653 (11th Cir. 1998), the court,
inter alia, stated:

> Finally, we may affirm a judgment as a matter of law only if the facts and inferences
> "point so overwhelmingly in favor of the movant . . . that reasonable people could
> not arrive at a contrary verdict."  Id. (citations and internal quotation omitted).

. . .

Once Bogle introduced Orange County's legitimate nondiscriminatory reason for his discharge, the initial presumption of discrimination accompanying the <u>prima facie</u> case dissolved, and the <u>McDonnell Douglas</u> framework required Bogle to demonstrate that the stated reason was pretextual. <u>Combs</u>, 106 F.3d at 1528.

. . .

Accordingly, Orange County was not entitled to judgment as a matter of law if Bogle produced any evidence that would permit a reasonable jury to disbelieve the proffered reasons for his discharge. (footnote omitted).

. . .

<u>See</u> Fed.R. Civ. P. 50(a)(1); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L. Ed.2d 265 (1986)(noting that the standard for a directed verdict and summary judgement are the same and that the absence of evidence on an essential element of a party's case will support judgment as a matter of law against that party); <u>Reeves v. City of Jackson</u>, 532 F.2d 491, 494 (5th Cir. 1976)("If, after a full development of the facts the plaintiff's cause is too weak to string the Constitution's bow or unsheath the sword provided for the redress of such grievances . . . it may be washed out on summary judgment . . . or, if it gets beyond that, by motion for directed verdict . . . at the end of the plaintiff's case. . ..")

In <u>Standard v. A.B.E.L. Services, Inc.</u>, ___ F.3d ___ (11th Cir. 1998), the court, <u>inter alia</u>,

stated:

In order to establish a case under Title VII, a plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence. The analytical framework and burden of production varies depending on the method of proof chosen.

. . .

Once Standard established his prima facie case, Plaster Concepts needed to rebut the presumption of discrimination by advancing legitimate, nondiscriminatory reasons for Standard's discharge. This is a burden of production, nor persuasion. Plaster Concepts need only produce evidence that could allow a rational fact finder to conclude that Standard's discharge was not made for a discriminatory reason. <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1528 (11th Cir. 1997), <u>cert. denied</u>, ___ U.S. ___, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998).

. . .

By presenting legitimate, nondiscriminatory reasons for Standard's termination, Plaster Concepts has rebutted the presumption of discriminatory intent. In light of this, Standard must now create a genuine issue of material fact as to whether the reasons advanced are pretextual. In other words, Standard must provide sufficient evidence to allow a reasonable fact finder to conclude that the proffered reasons were not actually the motivation for his discharge. Combs, 106 F.3d at 1538. Standard may do this (1) by showing that the legitimate non-discriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons. Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996) (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207(1981)).

. . .

Such explanation of a general reasons is insufficient to show pretext. Id., at 1377 (holding that plaintiff failed to show pretext when the employer's later statements merely offered more detail regarding perceived performance problems).

. . .

The district court found that his kind of minimal, technical discrepancy is insufficient to show pretext, and we agree.

. . .

The pretext inquiry is concerned with the employer's perception of the employee's performance, not the employee's own beliefs. Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997)(holding that when employer produces negative performance reviews, employee's assertion of his own good performance is insufficient to defeat summary judgment).

. . .

The heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons.

. . .

In order to directly attack Plaster Concepts' reasons, Standard must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find [all of those reasons] unworthy of credence." Combs, 106 F.3d at 1538.

. . .

"[A] plaintiff may not in all cases merely rest on the laurels of her prima facie case in the face of powerful justification evidence offered by the defendant." <u>Grigsby v. Reynolds Metals Co.</u>, 821 F.2d 590, 596 (11ᵗʰ Cir. 1987).

Both <u>Bogle</u> and <u>Standard</u> cite and rely upon <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519 (11ᵗʰ Cir. 1997) where the trial court's judgment was reversed for failure to grant judgment as a matter of law. The court, <u>inter alia</u>, stated:

> . . . According to the Supreme Court:

>> [The plaintiff] now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision .... [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

> <u>Id.</u> at 256, 101 S.Ct. at 1095 (emphasis added)(citation omitted). In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. <u>Id.</u>; <u>McDonnell Douglas</u>, 411 U.S. at 804, 93 S.Ct. at 1825.

> Although the Supreme Court in Hicks rejected the position that disbelief of the employer's proffered reasons requires judgment for the plaintiff, the Court was careful to explain that such disbelief, in tandem with the plaintiff's prima facie case, is sufficient to permit the factfinder to infer discrimination. The Court said:

>> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is required."

Id. at 511, 113 S.Ct. at 2749 (quoting Hicks v. St. Mary's Honor Ctr., 970 F.2d 487, 493 (8th Cir. 1992)) (footnote omitted) (second emphasis added).  That is a pretty clear statement.

. . .

Based on the Supreme Court's clear statement in the majority opinion in Hicks, read together with the rationale of the dissenting justices, we understand the Hicks Court to have been unanimous that disbelief of the defendant's proffered reasons, together with the prima facie case, is sufficient circumstantial evidence to support a finding of discrimination.  Therefore, it follows from Hicks that a plaintiff is entitled to survive summary judgment, and judgment as a matter of law, if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action.

. . .

Thus Hairston, our first decision on this issue following Hicks, clearly held that one way a plaintiff may succeed in establishing discrimination is by showing that the employer's proffered explanations are not credible.  When that happens, the plaintiff may or may not ultimately prevail in the litigation, because the factfinder may or may not choose to make the permissible inference of discrimination.  However, as we explained in Hairston, once the plaintiff introduces evidence sufficient to permit the factfinder to disbelieve the employer's proffered explanations, summary judgment is not appropriate, because "[i]ssues of fact and sufficiency of evidence are properly reserved for the jury."  Id. at 921.  We said nothing in Hairston about the plaintiff being required to establish anything more than a prima facie case plus the falsity of the tendered explanations; we said nothing about anything else being required for the plaintiff to avoid summary judgment, because nothing else is required.

. . .

Because the plaintiff in Batey had produced sufficient evidence for the factfinder to disbelieve the reasons that the employer proffered for the employment decision, we reversed the district court's grant of summary judgment for the employer.  Id. at 1335-36.  Consistent with our Hairston precedent, and with Hicks, we held that evidence of pretext, when added to a prima facie case, is sufficient to create a genuine issue of material fact that precludes summary judgment.  Id.

. . .

Case 1:98-cv-02541-RBP   Document 32   Filed 11/18/99   Page 7 of 64

In Walker v. NationsBank of Florida, 53 F.3d 1548 (11ᵗʰ Cir. 1995), a panel of this Court affirmed the grant of judgment as a matter of law in favor of the employer in an age and sex discrimination case, even though the plaintiff had established a prima facie case and had put on evidence sufficient to permit the factfinder to disbelieve all of the employer's proffered reasons for the adverse employment action. Id. at 1556-58. Despite that evidence, the Walker panel said that "Walker did not produce evidence that raised a suspicion of mendacity sufficient to permit us to find on this record that the bank intentionally discriminated against her on the basis of age and/or sex." Id. at 1558. For that reason, the panel concluded that "[r]easonable and fair-minded persons, in the exercise of impartial judgment, would not conclude that the bank had discriminated against [the plaintiff] on the basis of her age or sex." Id.

In a concurring opinion, Judge Johnson accurately noted that the majority had exceeded it proper role by "deciding whether evidence of pretext supports an inference of intentional discrimination," a task that requires credibility determinations and the weighing of evidence--which is the jury's function. Id. at 1563 (Johnson, J., concurring). As Judge Johnson pointed out, 53 F.3d at 1561-62, the majority's reasoning was not consistent with the teaching of Hicks, or without decisions in Howard and Batey. Judge Johnson agreed with the result in Walker only because, in his view, the evidence was not sufficient to permit a factfinder to reject the employer's proffered reasons for its action. Id. at 1564-65.

As we have recognized before, "no one is perfect, least of all federal appellate judges, and from our mistakes and oversights spring inconsistent decisions which we must deal with as best we can." United States v. Hogan, 986 F.2d 1364, 1369 (11ᵗʰ Cir. 1993). The Walker decision is a mistake.  not only is Walker inconsistent with the Supreme Court's clear instruction in Hicks, but is also inconsistent with the holdings of our Hairston, Batey, Howard, and Cooper-Houston decisions. Where there are inconsistent panel decisions, "the earliest panel opinion resolving the issue in question binds this circuit until the court resolves the issue en banc." United States v. Dailey, 24 F.3d 1323, 1327 (11ᵗʰ Cir. 1994) (quoting Clark v. Housing Auth. of Alma, 971 F.2d 723, 726 n. 4 (11ᵗʰ Cir. 1992)).  our next decision on the issue at hand is consistent with that principle, because it followed the law established in the earlier decisions instead of the Walker decision.

. . .

To summarize, with the exception of Walker, which is an anomaly, this circuit's post-Hicks decisions uniformly hold that once a plaintiff has established a prima facie case and has put on sufficient evidence to allow a factfinder to disbelieve an employer's proffered explanation for its actions, that alone is enough to preclude entry of judgment as a matter of law.

-7-

In discussing a hypothetical posed in a somewhat discredited <u>Isenbergh</u> opinion, the court stated:

> . . . The issue upon which judgment as a matter of law turns is whether the employer's proffered nondiscriminatory reason for its action, excessive lateness, may reasonably be disbelieved, not whether the employee was late nine times as opposed to seven.

> . . .

> In the hypothetical set up in the <u>Isenbergh</u> opinion, there is no evidence to discredit the employer's explanation that the defendant was fired for excessive lateness; the defendant's reason for its action remains unrebutted. So, the employer would be entitled to judgment as a matter of law under <u>Hicks</u>, 509 U.S. at 515-18, 113 S.Ct. at 2751-53 (discussing plaintiff's burden of discrediting the defendant's explanations), and under all of our prior decisions, including Hairston, Batey, and Howard.

> . . .

> When deciding a motion by the defendant for judgment as a matter of law in a discrimination case in which the defendant has proffered nondiscriminatory reasons for its actions, the district court's task is a highly focused one. The district court must, in view of all the evidence, determine whether the plaintiff has case sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct," <u>Cooper-Houston v. Southern Ry. Co.</u>, 37 F.3d 603, 605 (11th Cir. 1994)(citation omitted). The district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." <u>Sheridan</u>, 100 F.3d at 1072 (citation and internal quotation marks omitted); see also <u>Walker</u>, 53 F.3d at 1564 (Johnson, J., concurring)(discussing methods of proving pretext). However, once the district court determines that a reasonable jury could conclude that the employer's proffered reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action. At that point, judgment as a matter of law is unavailable.

> . . .

. . . We must, in view of all the evidence, determine whether the plaintiff has case sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct," Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994)

In Combs, the employer gave three reasons as to why it had promoted Walker instead of Combs. The appellate court determined that the plaintiff had submitted sufficient evidence to allow a reasonable juror to conclude that two of the articulated reasons did not actually motivate the employer's decision. The court held, however, that the district court had erred in not granting judgment as a matter of law because,

> In relying on Walker's financial improprieties to undermine Meadowcraft's explanation that it based its promotion decision on Walker's superior supervisory experience, Combs confuses disagreement about the wisdom of an employer's reason with disbelief about the existence of that reason and its application in the circumstances. Reasonable people may disagree about whether persons involved in past financial improprieties should be made supervisors, but such potential disagreement does not, without more, create a basis to disbelieve an employer's explanation that it in fact based its decision on prior non-financial supervisory experience. Meadowcraft's decision to promote Walker instead of Combs may seem to some to be bad business judgment, and to others to be good business judgment, but federal courts do not sit to second-guess the business judgment of employers. Stated somewhat differently, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer.

The court added,

> . . . Combs failed to produce evidence sufficient to permit a reasonable factfinder to disbelieve Meadowcraft's proffered nondiscriminatory explanation that it promoted Walker instead of Combs because Walker had superior supervisory experience. Because of that failure, the district court should not have permitted the case to go to the jury. Meadowcraft was entitled to judgment as a matter of law.

Combs indicates that a plaintiff cannot prevail merely because he or she casts doubt on one or more of a defendant's suggested reason(s) if the evidence does not raise a substantial issue about the

credibility of the other reason(s).

The court is well aware that some courts have indicated that summary judgment and judgment as a matter of law are particularly inappropriate in employment discrimination cases. This must be somewhat a repetition of anachronistic holdings. A myriad of Eleventh Circuit Court and other circuit court cases have either upheld the grants of such motions or have reversed trial courts for failing to grant such motions. In Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987), the court stated:

> We also recognize, however, that the inference of intentional discrimination raised by a plaintiff's prima facie case may be stronger or weaker, depending upon the facts of a particular case. . . . "To a large extent, of course, the strength or weakness of the inference of discrimination created by the employee's prima facie case defines the nature of the employer's rebuttal." . . . . In some cases the defendant's evidence of legitimate, non-discriminatory reason for its actions may be so strong as to rebut completely the inference raised by plaintiff's prima facie case. Such is the case here. Of course, even in the fact of such strong justification evidence, a plaintiff might still create an issue of fact and avoid summary judgment by introducing additional evidence of pretext. But a plaintiff may not in all cases merely rest on the laurels of her prima facie case in the fact of powerful justification evidence offered by the defendant. Without more, the evidence constituting Grigsby's prima facie case is not sufficient to create an issue of fact in light of the compelling evidence of lawful motive presented by Reynolds.

Id. at 595-96. Based on the foregoing, the court judges its task to determine the following:

       (1)     Has plaintiff offered evidence of a prima facie case?

       (2)     If she has, how strong is it?

       (3)     Has defendant offered rebuttal evidence?

       (4)     If so, how strong is it?  Is it strong enough to overcome a weaker prima facie case?

       (5)     If defendant's rebuttal is strong enough to overcome a weaker prima facie case, has

plaintiff offered sufficient evidence of pretext to create an issue of fact?

In Grigsby, supra, the court said, inter alia,

>    Grigsby also asserts that the district court erred in completely accepting Reynolds justification that it did not select her for the District Traffic Manager position because it found someone else who was objectively more qualified.  Her entire evidence on this point consisted of her affidavit and several accompanying exhibits.  Grigsby showed that her salary performance appraisal for the period preceding her application exceeded that of Regan Ragland, the candidate who was eventually chosen for the position.  Grigsby also asserted that the supposedly objective standards for the position were created after Ragland was selected for the job.  Further, Grigsby stated in her affidavit that she was told by Jim Ogborne, Reynolds' Customer Service Manager, that "the characters the Traffic Manager would have to deal with were pretty rough and he did not want me to have to deal with this type of thing."  Grigsby Aff. at 2. However, in light of Reynolds' extensive evidence of the relative qualifications of the applicants, Grigsby's testimony and exhibits simply fail to raise any inference of pretext or discriminatory intent.

>    It is undisputed that Ragland had far greater experience with Reynolds' cost accounting system, capitalization projects, auditing procedures, and computer systems than did Grigsby.  Ragland also had eight years experience in various departments of the Alloys plant, including four years experience supervising professional engineers, as opposed to Grigsby whose experience was largely limited to the smaller WRB plant.  Moreover, the fact that Grigsby received superior performance ratings in her WRB position does not refute the fact that Ragland was better qualified for the more sophisticated job Reynolds sought to fill in the Alloys plant.

Id. at 596.

>    This is not a situation where, as Grigsby contends, the district court impermissibly weighed the parties' evidence instead of merely looking for the existence of a genuine issue of fact.  Where the defendant's justification evidence completely overcomes an inference to be drawn from the evidence submitted by the plaintiff, the district court may properly acknowledge that fact and award summary judgment to the employer. Grigsby's conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where Reynolds has offered such extensive evidence of legitimate, nondiscriminatory reasons for its actions. See Meiri v. Dacon, 759 F.2d at 998 (conclusory allegations of discrimination insufficient to raise inference of pretext and thereby defeat summary judgment motion).  Under these circumstances, Reynolds was entitled to summary judgment.

Id. at 597.

In <u>Branson v. Price River Coal Co.</u>, 853 F.2d 768, 771-72 (10th Cir. 1988), the court stated:

However, we also hold the district court was justified in entering summary judgment on the grounds that plaintiffs failed to present any credible evidence on the issue of pretext. To avoid summary judgment, a party must produce "<u>specific</u> facts showing that there remains a genuine issue for trial" and evidence "'significantly probative' as to any [material] fact claimed to be disputed." <u>Steckl v. Motorola, Inc.</u>, 703 F.2d 392, 393 (9th Cir. 1983) (quoting <u>Ruffing v. County of Los Angeles</u>, 607 F.2d 1276, 1280 (9th Cir. 1979), <u>cert. denied</u>, 445 U. S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980)). Thus, plaintiffs' mere conjecture that their employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.

Mrs. Branson presented no evidence showing that the decision to eliminate her job was motivated by age discrimination and admits she would have required at least minimal training to assume any of the positions retained by younger employees. Her assertion that Price River should nonetheless have retained her is insufficient to create a genuine issue of fact regarding Price River's articulated reasons for her discharge and avoid summary judgment. The ADEA does not require employers to accord members of the protected class preferential treatment, but only that they treat age neutrally. <u>See</u> <u>Williams</u>, 656 F.2d at 129-30.

Mrs. Saccomanno also failed to create a genuine issue of fact regarding Price River's articulated reasons for her discharge. She admits Mr. Anderson "felt" she was less qualified than Mr. Hanson for the accounting department's remaining position and claims only that she was <u>in fact</u> equally or more qualified that Mr. Hanson. As courts are not free to second-guess an employer's business judgment, this assertion is insufficient to support a finding of pretext. <u>See</u> <u>Kephart v. Institute of Gas Technology</u>, 630 F.2d 1217, 1223 (7th Cir. 1980), <u>cert. denied</u>, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed. 2d 383 (1981). It is the perception of the decision maker which is relevant, not plaintiff's perception of herself. <u>Smith v. Flax</u>, 618 F.2d 1062, 1067 (4th Cir. 1980). Consequently, the district court's order of summary judgment was appropriate.

In <u>Hudson v. Southern Ductile Casting Corp.</u>, 849 F.2d 1372, 1376 (11th Cir. 1988), the court stated:

Although summary judgment should be granted with caution in employment discrimination cases, there are occasions when such disposition is appropriate. <u>See, e.g.</u>, <u>Beard v. Annis</u>, 730 F.2d 741 (11th Cir. 1984). This is one of those cases. Where, as here, full discovery has been conducted, the Supreme Court stated recently that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."

-12-

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986) (citations omitted). See also Celetex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We agree with the district court that the evidence in this case was such as to warrant summary judgment.

In Pace v. Southern Ry. System, F.2d 1383, 1391 (11ᵗʰ Cir. 1983), the court stated:

Where the ADEA plaintiff has show "no evidence 'which might infer that age was even a factor in the decision'" of which plaintiff complains summary judgment is warranted. Simmons v. McGuffey Nursing Home, Inc., 619 F.2d at 370. A plaintiff, when faced with a motion for summary judgment, cannot rely on attenuated possibilities that a jury would infer a discriminatory motive, but rather must come forward with sufficient evidence to establish a prima facie case and respond sufficiently to any rebuttal by the defendant to create a genuine issue of material fact. Even where a prima facie case has been established but the defendant has rebutted with a proffer of legitimate, nondiscriminatory reasons for the discharge, a genuine issue of material fact is not automatically presented. As the Supreme Court noted in Texas Dept. of Community Affairs v. Burdine, 450 U.S. at 254 n. 7, 101 S.Ct. at 1094 n. 7, once established a prima facie case creates a rebuttal presumption of discrimination; but this presumption alone does not create an inference that a material fact, sufficient to present a jury question, is an issue. See also Reeves v. General Food Corp., 682 F.2d 515, 521-22 & n. 9 (4ᵗʰ Cir. 1982). Cf. Moore v. Sears, Roebuck & Co., 464 F. Supp. at 366 ("Only in an extraordinary instance could rebuttal evidence be so conclusive as to permit summary adjudication). In Simmons, supra, defendants rebutted plaintiff's prima facie case by showing a legitimate, non discriminatory reason for the discharge and plaintiff failed to prove that age, rather than the nondiscriminatory reason, was the motivation for the decision. 619 F.2d at 371. this court held that summary judgment was appropriate because "[t]he possibility of a jury drawing a contrary inference sufficient to create a dispute as to a material fact does not reify to the point even of a thin vapor capable of being seen or realized by a reasonable jury." Id.

Plaintiff has not offered any evidence that other supervisors with similar records have been

retained.

At least two Eleventh Circuit cases have stated that "similarly situated" means "nearly

identical." See Nix, supra, 738 F.2d at 1185 and Davin v. Delta airlines, Inc., 678 F.2d 567, 570 (5ᵗʰ

Circuit, Unit B 1982). Also see Powell v. Postmaster General, 01911979, 3172/A2 (EEOC 1991).

See also Lacy v. Sec. of Treas., 01930795, 3877/B13 (EEOC 1993). See also Gacutan v. Sec. of

Army, 01911096, 3039/F3 (EEOC 1991).  See also <u>Payne v. Ill. Cent. R.R.</u>, 665 F.Supp. (W.D. Tenn. 1987).

In a recent Supreme Court case, the Court made it apparent that neither the presence of mechanical proof nor the absence of mechanical proof is conclusive.  In <u>O'Connor v. Consolidated Coin Caterers Corp.</u>, ___ U.S. ___, 116 S.Ct. 1307 (1996), the Court stated, <u>inter</u> <u>alia</u>:

> In our view, however, the proper solution to the problem lies not in making an utterly irrelevant factor an element of the prima facie case, but rather in recognizing that the prima facie case requires "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion.

The issue is not fairness, not bad judgment, nor mistake.  It is discrimination, <u>vel</u> <u>non</u>.  See <u>Nix v. WLCY Radio/Rahall Comm.</u>, 738 F.2d 1181 (11th Cir. 1984) where the court stated, <u>inter alia</u>,

> The "ultimate question" in a disparate treatment case is not whether the plaintiff established a prima facie case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." <u>United States postal Service Board of Governors v. Aikens</u>, 1983, 460 U.S. 711, 714-15, 103 S.Ct. 1478, 1481-82, 75 L.Ed.2d 403, 409-10; <u>see also</u> <u>Lehman v. Trout</u>, 1984, ___ U.S. ___, 104 S.Ct. 1404, 79 L.Ed.2d 732.
>
> . . .
>
> Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules.  "Title VII addresses <u>discrimination</u>." <u>Ferguson v. Veterans Administration</u>, 11th Cir. 1984, 723 F.2d 871, 872.  "Title VII is not a shield against harsh treatment at the workplace." <u>Jackson v. City of Kileen</u>, 5 Cir. 1981, 654 F.2d 1181, 1186.  Nor does the statute require the employer to have good cause for its decisions.  The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason. <u>Megill v. Board of Regents</u>,, 5 Cir. 1976, 541 F.2d 1073, 1077; <u>Sullivan v. Boorstin</u>, 1980, D.D.C., 484 F.Supp. 836, 842.  "While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination.  The employer's stated legitimate reason . . . does not have to be a reason that the judge or jurors would act on or approve." <u>Loeb v. Textron, Inc.</u>, 1 Cir. 1979, 600 F.2d 1003, 1012 n. 6.  Although WLCY's decision to fire Nix, and its refusal to reconsider that decision, might seem unfair or even "incredible" to

outside observers, Nix cannot prevail in his Title VII action for he has not established discriminatory intent.

A full consideration of the evidence and recent controlling law leads the court to the conclusion that defendant's motion for summary judgment is due to be granted.

DONE and ORDERED this _____ day of November, 1999.

ROBERT B. PROPST
**SENIOR UNITED STATES DISTRICT JUDGE**

Page 10

## FOSHEE & TURNER COURT REPORTERS

21

1      A.    Okay.  I was shipping and

2  production coordinator, which was responsible

3  for --

4      Q.    Just a second.  Sorry to interrupt.

5  But is shipping and production coordinator

6  the same thing as what I've heard as shipping

7  supervisor or did you later hold a position

8  of shipping supervisor?

9      A.    They combined them together.

10      Q.    Oh, okay.  But it was called the

11  same thing?

12      A.    Yes.

13      Q.    Well, tell me what your job duties

14  were as shipping and production coordinator?

15      A.    I was responsible for getting the

16  schedule out, as far as what was going to be

17  shipped the following day.  Communicating

18  with corporate, which is the main office, on

19  what they wanted us to produce, plus make

20  sure it got to the customer.  Responsible for

21  making sure that the product got on the truck

22  and shipped at a designated time and place,

23  responsible for keeping the cooler clean or

22

1   my area clean, communicating with the

2   customers, transportation.

3        Q.   Any other duties?

4        A.   No, sir.

5        Q.   The work areas that you had under

6   your supervision, did that include the cooler

7   and the shipping dock area?

8        A.   Yes, sir.

9        Q.   Were there any other work areas

10  that were under your supervision as shipping

11  supervisor?

12       A.   No, sir.  I know the duty that I

13  had was tubs, we put the product in tubs and

14  I was to make sure the plant had enough tubs

15  to put the product in.

16       Q.   Do I understand your position as

17  shipping supervisor correctly, that you were

18  kind of the last stop before the product got

19  put on the trucks to go to the customers?

20       A.   Correct.

21       Q.   Do you agree this was an important

22  job at the plant?

23       A.   Yes, sir.

## FOSHEE & TURNER COURT REPORTERS

**23**

```
 1      Q.    Do you agree that as shipping

 2  supervisor that you did have some safety

 3  sensitive duties regarding product?

 4      A.    Yes, sir.

 5      Q.    You were responsible for making

 6  sure that the product that was put on the

 7  trailer to be shipped was sanitary, correct?

 8      A.    Correct.

 9      Q.    And you were responsible for

10  keeping the cooling area and the shipping

11  dock area clean and sanitary; is that

12  correct?

13      A.    Correct.

14      Q.    You agree with me, don't you, that

15  if chicken goes bad, if it spoils, not only

16  can it make somebody really sick, but it can

17  kill people; do you agree with that?

18      A.    Yeah.

19      Q.    Tyson, when you were shipping

20  supervisor, Tyson was governed by USDA

21  federal regulations as well as their own

22  policies to make sure that the chicken was

23  kept sanitary before it was put on the truck;
```

29

1      A.    June 12th, 1997.

2      Q.    What was the reason for your

3 termination?

4      A.    I was terminated because I was a

5 black female.

6      Q.    What was the given reason for your

7 termination?

8      A.    The incident that had happened the

9 prior day.

10      Q.    What was that incident?

11      A.    A customer had came in

12 approximately around four, between three and

13 four, somewhere in there, A.M., and they had

14 loaded product on a smelly trailer and I

15 arrived about seven and it was -- it was my

16 fault that the night shift crew loaded the

17 trailer knowing that it was smelling the way

18 it was smelling.

19      Q.    Did you have to carry a radio when

20 you worked as shipping supervisor?

21      A.    Yes, sir.

22      Q.    Was that a two-way radio or how --

23 in other words, did you have to push a button

38

1   shipping supervisor, what was her job?

2       A.   She was second processing

3   supervisor.

4       Q.   What did she do in that job?   Do

5   you know what her job duties were?

6       A.   She was responsible for getting the

7   product -- once it reached her, to me.

8       Q.   Okay.   I've got you.   She was the

9   next link in the chain in front of you; is

10  that right?

11      A.   Right.

12      Q.   And was Mr. Sanders the person who

13  made the decision to put her in your job?

14  Iva, I'm talking about.

15      A.   I have no idea.

16      Q.   So you don't know.   The next

17  sentence states you worked there for eleven

18  years and had a very good record until Mr.

19  Sanders became the plant manager.   Is

20  -- first of all, did I read that correctly?

21      A.   Yes.

22      Q.   Is Mr. Sanders Ken Sanders?

23      A.   Yes, sir.

**39**

1        Q.   Do you know when he came to the

2   Heflin plant as the plant manager?  I see

3   that it says here, you say in the next

4   sentence within six months he fired me.   I

5   guess you were fired when?

6        A.    June.

7        Q.    12th, '97; was that correct?

8        A.    He came --

9        Q.    I guess --

10       A.    If I'm not mistaken of the day,

11   December, around that range of '96.

12       Q.    December '96?

13       A.    Right.

14       Q.    Does that sound about right to you?

15       A.    December of '96.

16       Q.    Yeah, okay.  Do you know where he

17   came from, was he a new hire or did he come

18   from another plant; do you know?

19       A.    He came from another plant.

20       Q.    You don't know which one?

21       A.    I do not know the particular plant.

22       Q.    The next sentence that is referred

23   to says, within six months he fired me and

**40**

1   the reason given by the company was untrue

2   and a pretext to hire a white person to take

3   my place.  Did I read that correctly?

4        A.   Yes, sir.

5        Q.   Is that a true statement?

6        A.   Yes, sir.

7        Q.   Do you think you would still be

8   working at Tyson had Mr. Sanders not gone to

9   that Heflin plant?

10       A.   Yes, sir.

11       Q.   So Mr. Sanders is the only person

12  you believe discriminated against you on the

13  basis of your race; is that right?

14       A.   Yes, sir.

15       Q.   You state in here that after Mr.

16  Sanders got there that he made a point to go

17  out of his way to write you up for things

18  that you did not do and that this -- does

19. that word say -- should it be culminated in

20  my termination?

21       A.   Yes, sir.

22       Q.   For something that you did not do.

23  Did I read that correctly?

41

1    A.    Yes, sir.

2    Q.    What did Mr. Sanders write you up

3  for?

4    A.    I was written up for -- we were

5  working on a Saturday and I was written up

6  that day because -- well, the next Monday,

7  because he stated that I had an attitude

8  problem.  He had asked me, I think it was

9  Friday, because we were going to work that

10  Saturday and they waited until late that

11  Friday afternoon to tell us that we had to

12  work Saturday.  And he asked me was I coming

13  in and I told him I wasn't, but I can, and I

14  was going to come in late.  He asked me why

15  and I stated because I had a hair

16  appointment, and we had -- I was president

17  over choir and there was an important church

18  meeting that I needed to be at, and I wanted

19  to go to it.  He stated that I couldn't go --

20  well, he asked me what time was I going to

21  come in.  I told him I couldn't give him a

22  time because I didn't know.  So he told me to

23  come on in.

**42**

1          So I went on in and I left -- it

2   was my understanding that he knew that I was

3   going to come in and I was going to leave and

4   go get my hair done and come back and then go

5   to the meeting.

6      Q.    What else did he write you up for,

7   if anything else that you can recall?  Had

8   Mr. Sanders ever written you up before that?

9      A.    No, sir.

10      Q.    That's the first time you had ever

11   been written up?

12      A.    Yes, sir.

13      Q.    And how many times did Mr. Sanders

14   write you up?

15      A.    I was -- I was wrote up for that

16   incident.  I was wrote up for that day before

17   -- of termination about the trailer.  I was

18   written up for product that they stated that

19   was un -- didn't have any ice on it.  Written

20   up for wood pallets -- plastic pallets that

21   were dirty, not keeping the cooler clean.

22      Q.    Take a look at this.  This may be

23   Exhibit Number 2.  Take a moment to look at

## FOSHEE & TURNER COURT REPORTERS

49

1          Q.   Right.  Okay.  Is that the right

2    way to do it?

3          A.   Prior to that, we was not doing it

4    that way.  We would load as we get it.

5    Because before you can load a trailer, the

6    trailer was inspected, which it was looked --

7    sometimes USDA would come out there, QC would

8    look at every trailer before you load that

9    product and say yes, you can load the trailer

10 - or no, you can't load the trailer.

11         Q.   Is it also -- was it also part of

12   your job duties that when a trailer was

13   pulled up, that if you noticed any problems

14   with it, you shouldn't put product on the

15   truck; is that right?

16         A.   Correct.

17         Q.   You were also kind of a last check

18   on that, that if there's a problem with it,

19   you need to let somebody know?

20         A.   Yes, sir.

21         Q.   So getting back to my earlier

22   question.  What exactly did Mr. Bolton say to

23   you in the conversation as far as how they

**50**

1   were loading the trucks?

2        A.    They were loading the trucks --

3   they was not waiting until they received a

4   whole load of product which is twenty pallets

5   before they load the truck.  They were

6   loading as is.

7        Q.    Okay.  But the truck was pulled up

8   to the back of the dock; is that right?

9        A.    Correct.

10       Q.    Other than that conversation with

11  Mr. Bolton that -- well, first of all, did

12  Mr. Bolton tell you anything else about

13  loading the trucks that you recall?

14       A.    No, sir.

15       Q.    Other than that statement about

16  loading the trucks, do you have any other

17  evidence which would suggest that any of the

18  problems that you were written up for were

19  continuing to exist after you left?

20       A.    No, sir.

21       Q.    I think it's clear from those two

22  charges we just looked at but I just want to

23  ask you this:  It's your claim in this case

**56**

1  says supervisor's signature, is that Jessie

2  Parker?

3       A.   Yes, sir.

4       Q.   Jessie Parker was what?  Was he

5  your supervisor?

6       A.   He was a shift manager.

7       Q.   Shift manager?  Would he have been

8  one of your supervisors?

9       A.   Yes, sir.

10       Q.   And in the middle it's witnessed by

11  John Chapman is that right?

12       A.   Yes, sir.

13       Q.   And do you agree that this is a

14  serious counseling statement that was given

15  to you on August 16, 1996?

16       A.   Yes, sir.

17       Q.   And kind of at the top middle where

18  it talks about what the unacceptable behavior

19  is, it says:  On 8-14-96 product from KD

20  8-9-96 -- KD means kill date; is that

21  correct?

22       A.   Yes.

23       Q.   Product from kill date 8-9-96 was

**57**

1  shipped to the Gadsden plant.  This product

2  was spoiled upon being received.  This

3  occurred as a direct result of not rotating

4  product.  By rotating product it's referring

5  there to rotating the product that is in the

6  cooler, correct?

7      A.   Correct.

8      Q.   And kind of like the milk at the

9  grocery store that had to be rotated so the

10 oldest stuff gets out as soon as possible; is

11 that right?

12     A.   Yes, sir.

13     Q.   What was y'all's -- what was your

14 goal as far as turning around product?  Like

15 if you got a product in with a kill date of

16 today, your goal would have been to put it on

17 the truck by when?

18     A.   That day.

19     Q.   That day, okay.  But here it says

20 that there was a product that was killed on

21 8-9-96 that wasn't shipped until 8-14-96 and

22 was spoiled and that is what they wrote you

23 up for; is that correct?

**58**

1        A.    Correct.

2        Q.    Do you dispute that that happened?

3        A.    No, sir.

4        Q.    Let's look at the next exhibit.

5    How long had Jessie Parker been your shift

6    manager?

7        A.    I do not recall the approximate

8    dates.  He was not there long.

9        Q.    Okay.

10       A.    During this time on this exhibit,

11   there were transportation problems as far as

12   getting trailers and the cooler was so jamb

13   packed 'til you didn't know what was in it,

14   you couldn't move around to get -- So that is

15   what happened on this.

16       Q.    Okay.

17       A.    This day.

18       Q.    All right.  Do you agree it was

19   your responsibility as supervisor to know

20   what the kill dates are on the product in

21   your cooler that you had supervisory

22   authority over?

23       A.    Yes.

**59**

1    Q.   Was Brad Holcomb ever your shift

2    manager?

3    A.   He was on night shift.

4    Q.   Did he -- did you ever work on the

5    night shift with him?

6    A.   No, sir.

7    Q.   Did he talk to you in December of

8    '96 about having to work on a Saturday?

9    A.   I don't recall.

10    Q.   Did Brad Holcomb, I'm talking about

11    that incident where they said at the last

12    minute we're going to have to work on

13    Saturday.  Did you ever have any

14    conversations with Brad about finding out

15    that you had to work on Saturday?

16    A.   No, sir.

17    Q.   Who did you talk to about those

18    conversations?

19    A.   We heard it through Ken.

20    Q.   Ken was the one who told you that

21    everybody needed to come in on Saturday?

22    A.   That we needed to work.

23

FOSHEE & TURNER COURT REPORTERS

**60**

```
1              (Whereupon, Defendant's Exhibit 5

2              was marked for identification and

3              a copy of same is attached hereto.)

4

5       Q.    Next exhibit, take a look at that

6  and let me know when you are ready, Exhibit

7  Number 5, is it?

8       A.    Okay.

9       Q.    Have you seen this document before?

10      A.    Yes, sir.

11      Q.    Yes, sir?

12      A.    Yes, sir.

13      Q.    Does this describe the incident you

14  were talking about when you were told you had

15  to come to work on Saturday?

16      A.    Yes, sir.

17      Q.    On that Friday in the first

18  paragraph, the 12-20-96, was Ken Sanders the

19  individual you had the conversation with when

20  you found out you had to come in on Saturday?

21      A.    Yes, sir.

22      Q.    And is it true that when he told

23  you you needed to come in on Saturday you
```

FOSHEE & TURNER COURT REPORTERS

61

1  told him that you had some things you needed

2  to do and would be late coming in?

3      A.   Yes, sir.

4      Q.   Is it true that he asked you to

5  give him a specific time?

6      A.   Correct.

7      Q.   And is it true that you said you

8  couldn't give him a specific time because he

9  would hold you to it?

10     A.   Yes, sir.

11     Q.   Is it true that he said, well,

12  that's the reason I'm asking for a time; did

13  he say that?

14     A.   He stated he wanted a time.

15     Q.   Okay.  Did he then ask you to come

16  to his office so y'all could talk

17  face-to-face?  Did y'all go in his office to

18  continue the conversation?

19     A.   I don't recall at that particular

20  time that we did, but we did talk that day.

21     Q.   You just don't recall where you

22  talked?

23     A.   It was in his office.

**62**

1       Q.   Oh, it was in his office?  Did he

2   tell you -- looking at the second paragraph,

3   is it true that he told you that you would be

4   required to be there at seven-thirty on

5   Saturday and that if he could, he would let

6   you go to the hair appointment; did he say

7   that?

8       A.   He told me to come on in at

9   seven-thirty, and I understood that I could

10   leave and go get my hair done and he said

11   we'll discuss it when you get back as far as

12   church, leaving for the church.

13       Q.   Well, looking at that last sentence

14   in the second paragraph where he says, I told

15   her that I would see if I could let her go

16   but she needed to plan on being here on

17   Saturday to help and support the rest of the

18   team.  Did he tell you that?

19       A.   He told me that I needed to be

20   there.

21       Q.   Right, okay.  And is it true that

22   he told you that if he could, he would let

23   you go to that hair appointment?

**63**

```
 1        A.   I do not recall him stating that if

 2   he could, he would let me go.  My

 3   understanding was that, come on in and then I

 4   can leave and come back.

 5        Q.   You told me earlier but I just want

 6   to make it clear.  When you left to go get

 7   your hair cut, you didn't tell anybody you

 8   were going, you just went and got it cut and

 9   came back?

10        A.   I told Edward.

11        Q.   Edward, Edward Bolton?

12        A.   Yeah.

13        Q.   You didn't tell --

14        A.   I didn't tell top management.

15        Q.   Mr. Sanders?  Okay.  And when you

16   came back from your haircut appointment --

17   let's see.  When was the next time you talked

18   to Mr. Sanders after you came back that day?

19        A.   I talked to him when I came back

20   because they said he was looking for me.

21        Q.   Did you go talk to him?

22        A.   Yes.

23        Q.   What did he say?  Was he upset with
```

**64**

1    you?

2         A.    Yes, sir.

3         Q.    Did he tell you that you should

4    have told him when you were leaving?

5         A.    I don't recall him saying that.

6         Q.    Was it in this conversation that

7    you asked if you could go to the meeting --

8         A.    Yes.

9         Q.    -- that afternoon and he said you

10   could not go?

11        A.    He told me I could not go.

12        Q.    Because he needed you at work; is

13   that right?

14        A.    He needed me at work and I should

15   have -- I should have decided which one was

16   more important, the church meeting or getting

17   my hair done.

18        Q.    Okay.  So his position was, is that

19   you could have done one or the other but not

20   both; is that right?  Is that what you think?

21        A.    When he said that.

22        Q.    Is that Ken Sanders' signature at

23   the bottom of this, bottom right, above his

## FOSHEE & TURNER COURT REPORTERS

**74**

1    Q.    Do you have any specific

2  recollection of anything that you told Ronnie

3  or Wally on this day when they called to

4  complain about the trucks?

5    A.    That I would call Cherri and -- to

6  get the trailers over there.

7    Q.    Right.  But again, and I'm not

8  trying to confuse you, Melisha, but I want to

9  know if you recall anything that you

10 specifically told Ronnie or Wally?  I know

11 you said you talked to Cherri also.  I want

12 to know if you remember anything, saying

13 anything to Ronnie or Wally in the phone

14 call?  I know you said you denied saying that

15 you can't do anything about that.  I just

16 want to know if you remember saying anything?

17    A.    We ship to them daily and no

18 specific date that I can recall that I stated

19 --

20    Q.    You don't remember?

21    A.    Right.

22    Q.    Okay.  Let's look at the next

23 paragraph. This says on Monday, January 27th,

**FOSHEE & TURNER COURT REPORTERS**

**75**

1    '97, John radioed you to have a trailer

2    removed from the box room dock door so trash

3    could be removed and you said that you told

4    somebody that they could move it.  Is that

5    true?  Are those two sentences true?

6          A.    Told Iva that they could -- they

7    could move it.

8          Q.    Right.  Is that true?

9          A.    Yes.

10          Q.    John did radio you?

11          A.    He did radio me.

12          Q.    And you replied back that you told

13    someone that they could move it?

14          A.    Correct.

15          Q.    Is that correct?

16          A.    Correct.

17          Q.    And then it says that John later

18    radioed you to please see that it was taken

19    care of and you did not respond.  Then he

20    radioed you two more times to see if you

21    copied the request and radioed you a third

22    time and you responded, he says in a tone or

23    volume he considered to be insolent and

FOSHEE & TURNER COURT REPORTERS

**76**

1   insubordinate.   Did that happen?

2         A.   I do not recall all those times.

3   At the time that he was radioing me, I had a

4   driver billing him out to be shipped.   I did

5   -- my radio was down on my side pocket where

6   it's clipped and I was mashing it down there

7   and I was talking up so he could hear me

8   because I didn't have it up to my mouth.

9         Q.   Isn't it true that he did try and

10  radio you several times but you didn't

11  respond to it because you were talking to

12  somebody?

13        A.   I did hesitate one time but he

14  stated three times, I do not recall the three

15  times.

16        Q.   Your paragraph that you wrote on

17  Number 3 down there towards the bottom of

18  that paragraph, you say, I did not answer him

19  on the repeats of understanding on the third

20  time.   Do you see that?

21        A.   I said ten four.

22        Q.   On the third time you said ten

23  four; do you see that?

FOSHEE & TURNER COURT REPORTERS

77

1    A.   Yes, sir.

2         Q.   So it was the third time that he

3    called that you finally said ten four; is

4    that right, according to your paragraph here?

5         A.   Yes, sir.

6         Q.   You're saying that when you finally

7    did say ten four the radio was on your hip so

8    you had to talk loud; is that right?

9         A.   Right, because the cooler, it's

10   loud.

11        Q.   In your little sentence at the

12   bottom here, though, you said the radio was

13   on the table, not on your hip; do you see

14   that?

15        A.   Yes, sir, that's my writing.

16        Q.   Do you think your memory was better

17   when you wrote this or sitting here today

18   about where the radio was?

19        A.   I wrote it the day they gave it to

20   me.

21        Q.   So does this refresh your

22   recollection that the radio was probably

23   sitting on the table?

102

1       Q.    This was presented to you and you

2  refused to sign it; is that correct?

3       A.    Correct.

4

5       (Whereupon, Defendant's Exhibit 11

6       was marked for identification and

7       same is attached hereto.)

8

9       Q.    Exhibit 11.  Again, take your time

10  to look at that.

11      A.    Go ahead.

12      Q.    This is a memo to you dated June

13  12, 1997, correct?

14      A.    Yes, sir.

15      Q.    Let's look over what we've got

16  here.  This is from John Chapman, correct?

17      A.    Yes, sir.

18      Q.    It says -- first substantive

19  paragraph says, on June 11, '97, the plant

20  quality assurance manager notified him there

21  was a trailer on the shipping dock door that

22  had a foul odor.  Do you agree that there was

23  a trailer on the shipping dock that had a

**103**

1  foul odor?

2      A.   Yes.

3      Q.   He said this odor was detectable in

4  second processing and was strong on the

5  shipping dock and shipping office.  Do you

6  agree with that?

7      A.   Yes, sir.

8      Q.   It says:  On investigation, the

9  trailer was found to have water and slime

10 running from underneath the bed.  Do you

11 agree with that?

12     A.   Yes, sir.

13     Q.   John says here he instructed you to

14 remove the trailer from the door immediately.

15 Do you agree he told you that?

16     A.   Yes, sir.

17     Q.   And then it says you asked him what

18 to do with the product that had already been

19 loaded; did you ask him that?

20     A.   Yes, sir.

21     Q.   Then John says here that he found

22 it incredible that anyone would load food

23 product onto a trailer in this condition.

**104**

1  Did you also find that incredible?

2      A.   Yes.

3      Q.   He says here he instructed you to

4  immediately unload the product from the

5  trailer and then pull the trailer away from

6  the door; did you do that?

7      A.   Yes.

8      Q.   Then he says he asked you how long

9  the trailer had been on the shipping dock and

10  says you stated it had been loaded by night

11  shift personnel; is that correct?

12      A.   Correct.

13      Q.   And then John says that it was

14  incomprehensible to him that you did not

15  investigate the source of this odor upon your

16  arrival at seven A.M.   It says this fact

17  demonstrates that her shipping personnel

18  loaded the trailer in this condition and that

19  they weren't properly trained.   It's true

20  that the night shift personnel did load the

21  trailer, correct?

22      A.   Correct.

23      Q.   How can you explain how the trailer

1  was loaded in this -- why this nasty trailer

2  was loaded?

3      A.   I don't understand why they loaded

4  the trailer.  QC had to let them load the

5  trailer because they are responsible for

6  checking the trailer before anything is put

7  on the trailer.

8      Q.   Who is QC?

9      A.   Quality control.

10     Q.   Who was the person responsible for

11 checking this trailer, if you know?

12     A.   I don't recall the name.  Anybody

13 can check the trailers out of the QC

14 department.  And I did -- you could smell it

15 before you even got -- you could smell it

16 coming up on Tyson property.  Once I did get

17 there, I was seeing what was going on.  When

18 I got there, they were already out there,

19 being QC and USDA and --

20     Q.   Did you recognize and agree this

21 was serious?

22     A.   Yes.  They shouldn't have loaded

23 it.

111

1  Fahrenheit.  Do you have any reason to

2  disagree with that statement?

3       A.   No, sir.

4       Q.   Next sentence says that you

5  informed John that both trailers had been on

6  the dock door with the doors open since at

7  least seven A.M.; is that true?

8       A.   Correct.

9       Q.   That's true?

10      A.   Correct.

11      Q.   While all this was taking place, it

12  says the USDA inspector found two pallets of

13  plastic pallets were on the shipping dock

14  that were unwashed and covered with pieces of

15  fat and meat.  Do you have any reason to

16  disagree with that statement?

17      A.   No, sir.

18      Q.   Then the next sentence quotes to

19  use some statements that were on prior memos

20  to you.  Do you see those?

21      A.   Yes, sir.

22      Q.   Do you see those three statements

23  there that are quoted from the prior ones to

**116**

1   the second paragraph says that the evidence

2   reveals that blacks and whites who exhibited

3   similar conduct were treated in the same

4   manner; do you agree with that, that is what

5   it says?

6        A.    That's what it states.

7        Q.    Right.  And do you agree that Ms.

8   Brooks concluded that you were discharged

9   because of unsatisfactory performance?

10            MR. BENNITT:  Objection to form.

11       Q.    And you can answer that question.

12       A.    That's what she states.

13       Q.    That's right.  And do you agree Ms.

14   Brooks' conclusion was reasonable based upon

15   the evidence that was before her?

16       A.    Based upon her.

17       Q.    Based upon what she had?

18       A.    Yes.

19       Q.    Other than your attorneys, who have

20   you talked to about your case?

21       A.    None other than my husband.

22       Q.    What have you said to your husband

23   about your case?

This form is affected by the Pri___ Act of 1974; See Privacy Act Statement ___ore completing this form.

☐ FEPA
☒ EEOC

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

_____ and EEOC

State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Melisha E. Heard | (205) 463-2190 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 131 Ervin Circle, Heflin, AL 36264 | | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Tyson Foods, Inc. | | (205) 253-2141 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 6879 Highway 9s, Heflin, AL 36264 | | 029 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☒ RACE  ☒ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify)

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 06/12/97 | 06/12/97 |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

I was employed by the above named employer for eleven years. During my employment I had a very good work record until Mr. Sanders, White male, manager, was hired. Within six months he began to write me up for thing I did not do. On or about June 12, 1997, I was discharged.

No acceptable reason was given to me for these adverse terms and conditions of employment.

I believe that I have been discriminated against, because of my race, Africian American, in violation of Title VII of the Civil Rights Act of 1964, as amended. I believe that I was discharged because of my race, Africian American and replaced with a white person. Similarly situated White employees are treated more favorable than I under the same and or similar circumstances.

ORIGINAL CHARGE FILED 12/03/97

DEFENDANT'S EXHIBIT

2  Heard
5-7-99

| ☐ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |

| I declare under penalty of perjury that the foregoing is true and correct.

(Dec. 1, 1997) File charge sent.

Date 1-13-98   Charging Party (Signature) | SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |

**FILE COPY**

# TYSON FOODS, INC.
## SALARIED
## JULY 1996 SALARY REVIEW

*Tyson*

### TEAM MEMBER INFORMATION

**SSN:** 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

**NAME:** HEARD, MELISHA E

**JOB TITLE:** COORD PLANT PRODUCTION          **TARGET BONUS PCT:**  8 %

### REPORTING RELATIONSHIP CODES

**DIVISION REGION:** 2320     **COMPLEX:** P230   **LOCATION:** 0910

DEFENDANT'S EXHIBIT

3    *Heard*
*5-7-9?*

### ANNUAL MERIT

**CURRENT SALARY: $**      27,200

**APPROVED SALARY INCREASE: $**  1,400     **PCT INCREASE:**  5.1 %

**NEW SALARY: $**   28,600

**SALARY GRADE:** 43      **MIN: $**  24.5      **MAX: $**  39.3

### PERFORMANCE ASSESSMENT

**PERFORMANCE OVER THE LAST 12 MONTHS HAS CONSISTENTLY
EXCEEDED EXPECTATIONS AND/OR OBJECTIVES (GOALS):**          _____

**PERFORMANCE OVER THE LAST 12 MONTHS HAS MET
EXPECTATIONS AND/OR OBJECTIVES (GOALS):**          _____

**PERFORMANCE OVER THE LAST 12 MONTHS HAS NOT MET
EXPECTATIONS AND/OR OBJECTIVES (GOALS):**          _____

**WORK OBJECTIVES FOR  NEXT PERIOD AND/OR AREAS FOR IMPROVEMENT:**

1) reduce shipping cost

2) improve on tub issues

3) accurate inventory's to production numbers

4) spoilage problems

**DEPARTMENT MANAGER:** Randy ___

5) Keeping coder empty

# Corrective Action Report

| Type of Action | Name: _Melisha Heard_ |
|---|---|
| ☐ Counseling Statement | SS #: _420-C6-8278_ |
| ☑ Serious Counseling Statement | Date: _8-16-96_ |
| ☐ Discharge | |

DEFENDANT'S
EXHIBIT
4
Heard
5-7-99

## Observed — Unacceptable Behavior
(who/what/when/where)

On 8-14-96, Product from RJJ 8-9-96 was shipped to the Gadsden plant. This product was spoiled upon being received. This occured as a direct result of not rotating product

## Standard Expected

Product in the cooler must be rotated dailey according to Kill date.

## Consequences — Action Taken

This is a written warning. Any further instance of this happening will result in termination.

## Acknowledgement

_Melisha Heard_
**Team Member Signature**

_John Clypn_
**Witness Signature**

_Jim Parker_
**Supervisor Signature**

TYSON 6853

TO: MELISHA HEARD
RE: LEAVING WORK ON SATURDAY (12-21-96)

ON FRIDAY (12-20-96) A DECISION WAS MADE THAT THE HEFLIN PLANT
WOULD NEED TO PROCESS SOME USDA HELD PRODUCT ON SATURDAY.
IN MAKING SURE ALL APPROPRIATE MANAGEMENT PERSONNEL WHERE HERE
MELISHA HAD STATED THAT SHE WAS NOT COMING IN. I THEN TOLD HER THAT
SHE WOULD NEED TO COME IN ON SATURDAY. SHE THEN TOLD ME THAT SHE
HAD THINGS SHE NEEDED TO DO AND WOULD BE LATE COMING IN. I ASKED
HER TO GIVE ME A TIME AND SHE SAID SHE WOULD NOT GIVE ME A TIME
BECAUSE I WOULD HOLD HER TO THAT TIME. I TOLD HER THAT, THAT WAS
THE REASON FOR ASKING ABOUT A TIME. SHE TOLD ME THAT SHE WAS NOT
GOING TO GIVE ME A TIME AND THAT I COULD DO WHAT EVER I HAD TO DO.
I THEN TOLD HER TO COME TO MY OFFICE SO WE COULD TALK FACE TO FACE.

IN THIS CONVERSATION I TOLD MELISHA THAT SHE WOULD BE REQUIRED TO
BE HERE AT 7:30 ON SATURDAY MORNING AND THAT IF I COULD I WOULD LET
HER GO TO HER HAIR APPOINTMENT. SHE SAID SHE ALSO HAD A MEETING AT
HER CHURCH SHE NEEDED TO GO TO AT 12:30. I TOLD HER THAT I WOULD
SEE IF I COULD LET HER GO BUT SHE NEEDED TO PLAN ON BEING HERE ON
SATURDAY TO HELP AND SUPPORT THE REST OF THE TEAM.

MELISHA CAME IN ON TIME ON SATURDAY BUT WAS FOUND TO BE GONE FOR
APPROXIMATELY ONE AND A HALF HOURS. WHEN ASKED SHE SAID THAT SHE
HAD GONE TO THE HAIR APPOINTMENT. I TOLD HER THAT I WOULD TALK TO
HER ON MONDAY AND THAT SHE NEEDED TO MAKE SURE THAT SHE DID NOT
LEAVE ANYMORE UNTIL PRODUCTION WAS OVER. SHE ASKED ME LATER IF SHE
COULD LEAVE TO GO TO THE CHURCH MEETING AND I TOLD HER NO.

MELISHA HAS SHOWN AN OVERALL DISREGARD FOR THE WELL BEING OF THIS
PLANT AND HER FELLOW TEAM MATES BY HER WORDS AND ACTIONS.
MELISHA IS SHOWING A POOR ATTITUDE IN REGARDS TO HER JOB AND IT IS
SHOWING IN HER PERFORMANCE.

THIS LETTER IS TO SERVE AS A SERIOUS COUNSELING STATEMENT TO
MELISHA. MELISHA NEEDS TO SHOW SOME SIGNIFICANT IMPROVEMENT IN THE
AREA OF ATTITUDE AND JOB PERFORMANCE IF SHE IS TO REMAIN ON THE
TYSON HEFLIN TEAM.

IF FURTHER DISCIPLINARY ACTION IS NEEDED ON MELISHA'S BEHALF, IT
WILL RESULT IN TERMINATION. THIS IS MELISHA'S SECOND SERIOUS
COUNSELING STATEMENT.

MELISHA HEARD              BRAD HOLCOMB              KEN SANDERS

Refuse To
Sign
Ken

12-23-97

DEFENDANT'S
EXHIBIT
5   Heard
5-7-99

TO:  MELISHA HEARD
RE:  JOB PERFORMANCE

ON MONDAY 12-23-96 MELISHA WAS GIVEN A SERIOUS COUNSELING STATEMENT
REGARDING IMPROVEMENTS THAT MUST BE MADE IN THE AREAS OF ATTITUDE
AND JOB PERFORMANCE.  SINCE THAT TIME, THE FOLLOWING UNACCEPTABLE
OCCURRENCES HAVE BEEN NOTED:

1.  ON MONDAY 1-20-97 VISITORS FROM A CURRENT TYSON CUSTOMER TOURED
THE HEFLIN FACILITY. ALL AREAS LOOKED UP TO STANDARD EXCEPT FOR THE
COOLER.  THERE WAS TRASH AND DEBRIS ON THE FLOOR OF THE COOLER AND
SHIPPING DOCK.    THIS IS DIRECTLY UNDER MELISHA'S CONTROL AND
REFLECTED BADLY UPON THE ENTIRE HEFLIN TEAM. HER RESPONSIBILITIES
IN THIS AREA HAVE BEEN VERBALLY CONVEYED TO HER SEVERAL TIMES SINCE
HER SERIOUS COUNSELING STATEMENT DATED 8-16-96.  AT THAT TIME THE
SHIFT MANAGERS JOHN CHAPMAN AND JESSE PARKER CLEARLY DEFINED HER
RESPONSIBLITY TO KEEP THE COOLER AND DOCK IN A SANITARY MANNER.

2.   OUR CUSTOMER KOCH FOODS HAS COMPLAINED THAT WHEN MELISHA HAS
BEEN NOTIFIED THAT THEY NEEDED PRODUCT FOR THEIR PRODUCTION LINES,
SHE HAS RESPONDED "I CAN'T DO ANTHING ABOUT THAT".  MELISHA IS THE
SHIPPING SUPERVISOR.  IF THEIR ARE PROBLEMS WITH THE TRANSPORTATION
OF PRODUCT FROM THIS FACILITY TO A CUSTOMER THAT SHE CANNOT
CONTROL, THEY NEED TO BE BROUGHT TO THE ATTENTION OF UPPER
MANAGEMENT SO THAT THEY CAN BE RESOLVED.  THE ATTITUDE THAT SHE IS
PORTRAYING TO OUR CUSTOMER IS THAT WE REALLY DON'T CARE IF THEY
RECEIVE OUR PRODUCT OR NOT.  THIS IS TOTALLY UNACCEPTABLE.

3.  ON MONDAY 1-27-97 SHIFT MANAGER JOHN CHAPMAN RADIOED MELISHA TO
HAVE A TRAILER REMOVED FROM THE BOXROOM DOCK DOOR THAT TRASH COULD
BE REMOVED.  SHE REPLIED THAT SHE TOLD SO-AND-SO THAT THEY COULD
MOVE IT.  THE SHIFT MANAGER THEN RADIOED FOR MELISHA TO PLEASE SEE
THAT IT WAS TAKEN CARE OF.  SHE DID NOT RESPOND.  SHE WAS THEN
RADIOED TWO MORE TIMES TO SEE IF SHE HAD COPIED THE REQUEST.  SHE
WAS THEN RADIOED A THIRD TIME AND RESPONDED IN A TONE AND VOLUME
THAT WAS CONSIDERED BY THE SHIFT MANAGER, AS WELL AS THE PLANT
MANAGER WHO WAS LISTENING, TO BE INSOLENT AND INSUBORDINATE.

AT THIS TIME MELISHA WILL BE SUSPENDED FOR A PERIOD OF THREE DAYS
WITHOUT PAY WHILE THIS MATTER IS INVESTIGATED.  SHE IS TO RETURN TO
WORK ON FRIDAY 1-31-97 FOR THE RESULTS OF THE INVESTIGATION.

_John Chapman_ (signature)

_Refused to sign_ (signature)

WITNESSED BY:
_Bob Leonard_ (signature)

DEFENDANT'S
EXHIBIT
6

Heard
5-7-99

I was aware of visitors coming into the facility. At that time I made a tour of the coaster. Only thing that was real noticable were the wood pallet. There was no trash in the floor at that time. I am constantly picking up paper and etc. all during the day.

(2) I was never notified of any complaints from Greg of my "attitude". They have called and let me know that trucks were late and I would notify transportation / Cherr. And she would say that they are doing the best she can etc.

(3) I do not feel I have a "attitude problem" Chris came to me and stated that he needed to get the trash out. I told him let them unload the trailer of tubs first. he stated something about it had been 3 day and he was unable to get the trash out. I told him the needed it moved to call Newman to go ahead and move it. later John called and asked me to get the trailer move I did not answer him on the reference of understanding on the old one I said Ok y and then stated that it was a attitude voice for Ken Sanders.

At this time Tubs billing out and talking so while to John was talking to the radio on the radio was on the radio are late

TO:  MELISHA HEARD, SHIPPING SUPERVISOR

FROM:  JOHN CHAPMAN, SHIFT MANAGER

DATE:  JANUARY 31, 1997

SUBJECT:  JOB EVALUATION



DEFENDANT'S EXHIBIT
7   Heard
5-7-99

     IT IS ONE OF THE DUTIES OF MANAGEMENT TO ENCOURAGE AND DEVELOP
THE GROWTH OF SUPERVISORS AND TO HELP THEM TO REALIZE THEIR
POTENTIAL AS MANAGERS OF PEOPLE AND RESOURCES.  ANOTHER DUTY IS TO
TAKE THE NECESSARY CORRECTIVE ACTION WHEN A SUPERVISOR MISMANAGES
RESOURCES AND/OR FAILS TO MAINTAIN THEIR DEPARTMENT IN A SAFE AND
SANITARY FASHION.  AS PARTS OF THE HEFLIN MANAGEMENT TEAM, WE MUST
EACH LIVE UP TO THE DUTIES AND RESPONSIBILITIES THAT ARE ASSIGNED
TO US.  FAILURE ON THE PART OF ONE TEAM MEMBER CAN REFLECT BADLY
UPON THE ENTIRE TEAM.
     AT THIS POINT IN TIME, YOU ARE STRONGLY ENCOURAGED TO EVALUATE
YOUR LEVEL OF JOB PERFORMANCE, MANAGEMENT PHILOSOPHY, MENTAL
ATTITUDE, AS WELL AS YOUR COMMITMENT TO BEING A PRODUCTIVE MEMBER
OF THE TYSON OF HEFLIN MANAGEMENT TEAM.  TO IDENTIFY SOME SPECIFIC
AREAS OF YOUR JOB PERFORMANCE, A JOB PERFORMANCE REVIEW WILL BE
CONDUCTED ON THIS DAY.  YOUR EFFECTIVENESS AS A MANAGEMENT MEMBER
WILL BE EVALUATED NO LATER THAN 30 DAYS FROM THIS CALENDAR DATE.
THIS EVALUATION PERIOD MAY BE EXTENDED AT THE DISCRETION OF THE
SHIFT AND PLANT MANAGERS.
     BELOW PLEASE FIND DETAILED JOB PERFORMANCE AND MANAGEMENT TEAM
MEMBER REQUIREMENTS.  THESE SHOULD HELP DISPEL ANY MISCONCEPTIONS
THAT YOU MIGHT HAVE REGARDING YOUR CURRENT POSITION AS SHIPPING
SUPERVISOR.  THIS LIST MAY NOT BE ALL-INCLUSIVE.


MAINTAIN THE COOLER, SHIPPING DOCK AND DOCK EXTERIOR IN A CLEAN AND
SANITARY MANNER AT ALL TIMES.

MONITOR THE AMBIENT COOLER AND TRUCK TEMPERATURES SO THAT OUR
PRODUCT IS HELD AND TRANSPORTED WITH MINIMAL RISK OF SPOILAGE.

COOLER DOORS ARE TO BE KEPT CLOSED EXCEPT FOR REQUIRED TRAFFIC.

TRAILERS SHOULD BE PRE-COOLED PRIOR TO LOADING.  THE UNITS SHOULD
BE CUT OFF WHEN THE DOOR IS UP TO PREVENT THEM FROM FREEZING.

PERIODICALLY INSPECT THE FLOOR, WALLS, DRAINS, DRAIN COVERS,
CEILINGS, OVERHEAD STRUCTURES, DOORS AND EQUIPMENT TO ENSURE THEY
ARE KEPT IN A SANITARY MANNER.  ANY DEFICIENCIES SHOULD BE PROMPTLY
CORRECTED.  THIS FREQUENCY SHOULD BE NO LESS THAN TWICE PER WEEK.

TEAM MEMBERS UNDER YOUR DIRECT SUPERVISION SHOULD BE TRAINED IN
PROPER SAFETY PROCEDURES AND HYGIENE PRACTICES.  THIS SHOULD BE
MONITORED FOR COMPLIANCE.

PRODUCT SHOULD ALWAYS BE PROPERLY STORED, LOADED AND MANIFESTED.

MAINTAIN AN OPEN LINE OF COMMUNICATION WITH OUR CUSTOMER(S) AND
TRANSPORTATION DEPARTMENT SO THAT OUR PRODUCT REACHES OUR CUSTOMER
IN A TIMELY MANNER.  COMMUNICATIONS WITH PEOPLE OUTSIDE (AS WELL AS
INSIDE) OUR PLANT SHOULD BE CONDUCTED IN A POLITE, COURTEOUS AND
PROFESSIONAL MANNER.  AS THE SHIPPING SUPERVISOR AT HEFLIN, YOU
SERVE AS AN AMBASSADOR FOR OUR MANAGEMENT TEAM AND FOR THE COMPANY.

YOUR DUTIES RELATING TO THE COORDINATING FUNCTIONS OF YOUR POSITION
SHOULD BE CARRIED OUT IN A CLEAR, PROFESSIONAL AND TIMELY MANNER.

THE SHIPPING DEPARTMENT IS CURRENTLY OVERSTAFFED.  STAFFING SHOULD
BE CUT TO NO MORE THAN TWO HOURLY TEAM MEMBERS PER SHIFT.  THE
SHIFT MANAGERS AND PERSONNEL DEPARTMENT CAN ASSIST IN EXECUTING
THIS ASSIGNMENT.

ANY PROBLEM THAT OCCURS THAT IS BEYOND THE SCOPE OF YOUR AUTHORITY
OR ABILITY IS TO BE COMMUNICATED TO THE SHIFT OR PLANT MANAGERS SO
THAT THE NEEDS OF OUR CUSTOMER CAN BE BETTER MET.

NORMAL DAILY WORK SCHEDULE WILL BE FROM 7:00 A.M. UNTIL 2ND
PROCESSING FINISHES FOR THE DAY.  THIS SHOULD NOT BE DEVIATED FROM
WITHOUT THE PERMISSION OF A SHIFT OR PLANT MANAGER.

I HAVE READ AND UNDERSTOOD THIS STATEMENT.

MELISHA HEARD                     WITNESS                  JOHN CHAPMAN

Position: Shipping Supervisor          Dept:
Supervisor: John Chapman               Date: 1-31-97
Review should be scheduled during:

# JOB PERFORMANCE REVIEW

This form is designed to assist a team member and his/her supervisor as they meet to review the job and the team member's performance. Both parties have an opportunity to learn how they can help one another--to grow, to make the job easier, to do the work better, and to enjoy it more. It's okay to share praise and give positive reinforcement.

In short, a good performance review is a two-way street, with communication flowing up and down. To further increase the benefits of upward communication, this form will be reviewed by the Department Head, and maintained in the team member's file.

**BEFORE THE MEETING** — About a week before the team member's review, the Personnel Department will send three copies of the form to the supervisor, who should give the team member a copy, agree on a date and time for the review meeting, and ask the team member to complete the Job Performance Review in advance (as self-evaluation). Working independently, the supervisor will also review the team member's performance, filling out a copy in advance.

**DURING THE MEETING** — The performance review is a time for both parties to compare and discuss their ratings and agree on actions that each can do to improve the job and/or the team member's performance in that job. Both parties should make additions and changes to their copies to to bring them closely into agreement. Then the supervisor and team member should agree on the areas to be worked on during the coming review period, and the actions each will take to improve, maintain, and better utilize the team member's skills and abilities. Finally, both parties should sign.

**AFTER THE REVIEW** — The team member and supervisor each keep a copy. The supervisor sends a third copy (made on the copy machine or by hand on the third blank form) to his/her Department Head who reviews it, signs, and forwards it to the Complex Personnel Manager where it is retained in the team member's permanent file.

## DEFINE THE JOB ITSELF

In preparing for the performance review, get out a copy of the job description and go over it in advance of the review meeting. Indicate any changes that should be made. Add major duties that are now performed but are not listed on the job description. Delete duties that are no longer performed. Expand on duties or responsibilities that are described in terms that are too general.

4-22-93


DEFENDANT'S EXHIBIT
8
Heard
5-7-99

# PERFORMANCE APPRAISAL

| NAME | POSITION | DATE ASSIGNED TO PRESENT POSITION |
|---|---|---|
| APPRAISAL PERIOD | DIV/LOC | S.S.N. |

APPRAISAL CODES: May be expressed in the form of a decimal if a rating is between 4 & 5. You may give a person an appraisal code of 4.5.

1.0–LIMITED: Employee has not been in the job long enough to fairly and fully evaluate performance.

2.0–UNSATISFACTORY/MARGINAL: The level of performance during this rating period fell considerably short of the established standards of performance or expectations.

3.0– The level of performance during this rating period approached but did not fully meet the established standards of performance or expectations.

4.0– The level of performance during this rating period met the established standards of performance or expectations.

5.0– The level of performance during this rating period exceeded the established standards of performance or expectations.

6.0– The level of performance during this rating period far exceeded the established standards of performance of expectations.

| EVALUATION FACTORS | Appraisal Codes |
|---|---|
| **1. Job Knowledge/Skills**<br>Consider: Appropriate technical, professional, or scientific knowledge; understanding of Company policies, rules and regulations, keeping up with developments in t in the field. | 3.5 |
| **2. Dependability**<br>Consider: To what degree can the team member be relied upon to adhere to established work schedules and to carry out work assignments without close, constant supervision? How well does the team member plan and organize his or her work? Manage his or her time? | 2 |
| **3. Interpersonal Relationships**<br>Consider: How well does the team member get along with others? Consider relationships with other team members and people outside the Company with whom the team member has contact as a part of this. | 2 |
| **4. Communication**<br>Consider: Communicating orally, making presentations, giving instructions or directions, communicating in writing, listening, being open straightforward, sincere, honest, tactful. | 2.5 |
| **5. Initiative**<br>Consider: Relies on efforts to get the job done; needs little or no prodding; has ability to create new and unique way of getting things done; is a self-starter. | 3 |
| **6. Administrative**<br>Consider: Scheduling and organizing of own work, managing time, clarity and accuracy of records, setting work priorities and following work specifications and procedures. | 2 |
| **7. Problem Solving**<br>Consider: Skillfulness in solving the problems inherent in work, decisiveness, willingness to review and improve procedures, analytical ability. | 2.5 |
| **8. Decision Making**<br>Consider: Ability to make decisions, utilize working time to best advantage, plan logically. | 3 |
| **9. Accountability**<br>Consider: Cost awareness; initiates new technique programs, or ideas to reduce operating cost; encourages, explains and shows team members how to reduce waste and work more efficiently. | 2 |
| **10. Development of People**<br>Consider: Ability to select, train and promote the continued growth of subordinates; understands individual differences in learning and ability; recognizes deficiencies in subordinates and assists in overcoming them; effectively utilizes assigned personnel and delegates effectively. | 2.5 |
| TOTAL | 25 |

FORM A JOB-APP1 4/23/93

# SUPERVISOR'S NARRATIVE

### EVALUATION FACTOR COMMENTS: PLEASE EXPLAIN THE RATING.

1. **JOB KNOWLEDGE/SKILLS:** Melisha has demonstrated a limited knowledge of the fundamentals of her current position.

2. **DEPENDABILITY:** Melisha has demonstrated that she is unable to carry out daily activities without the direct involvement of upper management. A majority of her time has been observed spent in the breakroom and reception area.

3. **INTERPERSONAL RELATIONSHIPS:** Does not work well with others. Often short, terse and disrespectful in interactions within this facility as well as our customer. Customer has complained that Melisha has not been helpful, and has been nonchalant to their needs.

4. **COMMUNICATION:** It has been observed that little or no effort has been made on her part to communicate with her peers on matters of daily business.

5. **INITIATIVE:** Has been frequently prodded to perform some of the basic functions of her job, specifically keeping the cooler and dock clean and keeping the cooler doors closed.

6. **ADMINISTRATIVE:** Does not schedule work effectively, has shown difficulty setting work priorities.

7. **PROBLEM SOLVING:** Has demonstrated a limited ability to solve inherent work problems. Has demonstrated an unwillingness to improve procedures.

8. **DECISION MAKING:** Has demonstrated some decision making ability. Does not utilize work time well.

9. **ACCOUNTABILITY:** Has shown no desire to reduce waste or cost. Does not utilize personnel effectively.

10. **DEVELOPMENT OF PEOPLE:** Melisha has demonstrated the ability to recognize deficiencies in subordinates but no evidence of improving those deficiencies has been noted. Dept is currently overstaffed substantially.

## TEAM MEMBER COMMENTS

I agree or disagree with this appraisal of my performance for the period covered by this report, and my reasons are as follows:

I feel that I do have knowledge and use well dependable in all my job functions. I get along well with others. I feel that most of the statements are untrue.

*M. Arnold*

| Team Member Signature | DATE |
| --- | --- |

*John Chapman*    1-31-97
Supervisor Signature    Date   1-31-97

*Robert Skinner*   31 JAN 97
APPROVAL Signature   Date
WITNESS

Position: _____ Dept. _____
Supervisor: (John Creighton)          Date: 3-3-97
Review should be scheduled during: _____

# JOB PERFORMANCE REVIEW

This form is designed to assist a team member and his/her supervisor as they meet to review the job and the team member's performance. Both parties have an opportunity to learn how they can help one another—to grow, to make the job easier, to do the work better, and to enjoy it more. It's okay to share praise and give positive reinforcement.

In short, a good performance review is a two-way street, with communication flowing up and down. To further increase the benefits of upward communication, this form will be reviewed by the Department Head, and maintained in the team member's file.

| | |
|---|---|
| BEFORE THE MEETING | About a week before the team member's review, the Personnel Department will send three copies of the form to the supervisor, who should give the team member a copy, agree on a date and time for the review meeting, and ask the team member to complete the Job Performance Review in advance (as self-evaluation). Working independently, the supervisor will also review the team member's performance, filling out a copy in advance. |
| DURING THE MEETING | The performance review is a time for both parties to compare and discuss their ratings and agree on actions that each can do to improve the job and/or the team member's performance in that job. Both parties should make additions and changes to their copies to to bring them closely into agreement. Then the supervisor and team member should agree on the areas to be worked on during the coming review period, and the actions each will take to improve, maintain, and better utilize the team member's skills and abilities. Finally, both parties should sign. |
| AFTER THE REVIEW | The team member and supervisor each keep a copy. The supervisor sends a third copy (made on the copy machine or by hand on the third blank form) to his/her Department Head who reviews it, signs, and forwards it to the Complex Personnel Manager where it is retained in the team member's permanent file. |

## DEFINE THE JOB ITSELF

In preparing for the performance review, get out a copy of the job description and go over it in advance of the review meeting. Indicate any changes that should be made. Add major duties that are now performed but are not listed on the job description. Delete duties that are no longer performed. Expand on duties or responsibilities that are described in terms that are too general.

4/22/93

DEFENDANT'S
EXHIBIT

9     Heard
5-7-99

## SUPERVISOR'S NARRATIVE

EVALUATION, OR COMMENTS: PLEASE EXPLAIN THE RATING. ✷

1. **JOB KNOWLEDGE/SKILLS:** Melisha has demonstrated a limited knowledge of the fundamentals of her current position.

2. **DEPENDABILITY:** Melisha is performing the majority of her daily activities without direct supv. She appears to be better managing and organizing her time.

3. **INTERPERSONAL RELATIONSHIPS:** Has made some improvement in her interactions with others. No customer complaints have been recorded.

4. **COMMUNICATION:** Melisha is doing better at communicating with others. However, her replies are still usually short and her attempts at smiling are obviously forced. The attempt is noted and appreciated.

5. **INITIATIVE:** Needs prodding to perform some functions of her job. Cooler doors are still staying open and the doobi + dock housekeeping needs improving.

6. **ADMINISTRATIVE:** Still has some difficulties setting work priorities.

7. **PROBLEM SOLVING:** Has demonstrated a limited ability to solve inherent work problems.

8. **DECISION MAKING:** Melisha has demonstrated some decision making ability.

9. **ACCOUNTABILITY:** Waste + cost reduction skills still needs some improvement. Has reduced her dept size as instructed on one shift but not on the other.

10. **DEVELOPMENT OF PEOPLE:** Melisha has demonstrated the ability to recognize deficiencies in subordinates. She has reduced her dept staffing to an acceptable level on day shift. Night shift still is overstaffed.

### TEAM MEMBER COMMENTS

I agree or disagree with this appraisal of my performance for the period covered by this report, and my reasons are as follows:

_____
_____
_____
_____
_____
_____

Melisha Head          3-5-97
Team Member Signature          DATE

John Chapman          3-3-97
Supervisor Signature          Date

✷ Evaluation period has been extended to March 31, 1997

Robert _____          5MAR97
APPROVAL Signature          Date
Witness  Main Personnel Mgr

JOB/APP: V27/93

| NAME | POSITION | DATE ASSIGNED TO PRESENT POSITION |
|---|---|---|
| APPRAISAL PERIOD | DIV/LOC | S.S.N. |

APPRAISAL CODES: May be expressed in the form of a decimal if a rating is between 4 & 5. You may give a person an appraisal code of 4.5.

1.0-LIMITED: Employee has not been in the job long enough to fairly and fully evaluate performance.

2.0-UNSATISFACTORY/MARGINAL: The level of performance during this rating period fell considerably short of the established standards of performance or expectations.

3.0- The level of performance during this rating period approached but did not fully meet the established standards of performance or expectations.

4.0- The level of performance during this rating period met the established standards of performance or expectations.

5.0- The level of performance during this rating period exceeded the established standards of performance or expectations.

6.0- The level of performance during this rating period far exceeded the established standards of performance or expectations.

| EVALUATION FACTORS | Appraisal Codes |
|---|---|

## 1. Job Knowledge/Skills
Consider: Appropriate technical, professional, or scientific knowledge; understanding of Company policies, rules and regulations, keeping up with developments in t in the field.

3.5

## 2. Dependability
Consider: To what degree can the team member be relied upon to adhere to established work schedules and to carry out work assignments without close, constant supervision? How well does the team member plan and organize his or her work? Manage his or her time?

3.5

## 3. Interpersonal Relationships
Consider: How well does the team member get along with others? Consider relationships with other team members and people outside the Company with whom the team member has contact as a part of this.

3.5

## 4. Communication
Consider: Communicating orally, making presentations, giving instructions or directions, communicating in writing, listening, being open straightforward, sincere, honest, tactful.

3.0

## 5. Initiative
Consider: Relies on efforts to get the job done; needs little or no prodding; has ability to create new and unique way of getting things done; is a self-starter.

3.0

## 6. Administrative
Consider: Scheduling and organizing of own work, managing time, clarity and accuracy of records, setting work priorities and following work specifications and procedure controls.

2.5

## 7. Problem Solving
Consider: Skillfulness in solving the problems inherent in work, decisiveness, willingness to review and improve procedures, analytical ability.

2.5

## 8. Decision Making
Consider: Ability to make decisions, utilize working time to best advantage, plan logically.

3

## 9. Accountability
Consider: Cost awareness; initiates new technique programs, or ideas to reduce operating cost; encourages, explains and shows team members how to reduce waste and work more efficiently.

3

## 10. Development of People
Consider: Ability to select, train and promote the continued growth of subordinates; understands individual differences in learning and ability; recognizes deficiencies in subordinates and assists in overcoming them; effectively utilizes assigned personnel and delegates effectively.

3.5

TOTAL    3.1

FORM A  JOBAPP1 6/22/93

TO:  MELISHA HEARD

FROM:  JOHN CHAPMAN

DATE:  MAY 16, 1997

RE:  JOB PERFORMANCE



THE FOLLOWING INSTANCES HAVE OCCURRED WHICH ARE UNACCEPTABLE:

FLAPS ON COOLER DOORS HAVE BEEN LEFT PROPPED BACK SEVERAL TIMES. THIS PREVENTS THE COOLER FROM MAINTAINING PROPER REFRIGERATION. REFERENCE:  JOB PERFORMANCE REVIEW, 1-31-97; JOB EVALUATIION, 1-31-97; JOB PERFORMANCE REVIEW, 3-3-97.

PALLETS OF PRODUCT (PAWS) WERE LEFT ON THE THE SHIPPING DOCK. PROPER TEMPERATURE WAS NOT MAINTAINED AND SIGNIFICANT WEEPAGE WAS FOUND WHEN CASE WAS OPENED.  THIS PRODUCT SPOILS EASILY AND MUST BE SAFEGUARDED FROM TEMPERATURE ABUSE.  REFERENCE:  JOB EVALUATION, 1-31-97.

MELISHA HAS BEEN FORMALLY COUNSELED CONCERNING THE IMPORTANCE OF EFFECTIVELY COMMUNICATING INFORMATION TO THE SHIFT AND PLANT MANAGERS.  A RECENT INCIDENT DEMONSTRATED THAT THIS COMMUNICATION IS STILL NOT TAKING PLACE:  A LOAD OF PRODUCT WAS SHIPPED OUT OF SEQUENCE TO THE ATTALLA FREEZER.  THIS CAUSED LOADS LATER IN THE DAY TO BE SHIPPED SHORT.  WHEN OUR CUSTOMER (TERRY RUSSELL) CALLED CONCERNING THE INCIDENT, NEITHER THE PLANT OR SHIFT MANAGER KNEW ABOUT IT.   THIS IS CANNOT BE TOLERATED.  REFERENCE:  JOB PERFORMANCE, 1-27-97; JOB PERFORMANCE REVIEW, 1-31-97; JOB EVALUATION, 1-31-97; JOB PERFORMANCE REVIEW, 3-3-97.

IT HAS BEEN THE PRACTICE OF OUR SHIPPING DEPARTMENT TO PROVIDE LOAD LOCKS TO DRIVERS OF TRAILERS THAT DO NOT HAVE THEM.  LOAD LOCKS ARE NECESSARY TO PREVENT SPILLAGE AND LOSS OF PRODUCT.   THESE LOAD LOCKS ARE TO BE BILLED OUT AND THE COST PASSED ON TO THE TRANSPORTATION PROVIDER. MELISHA HAS BEEN QUESTIONED SEVERAL TIMES BY THE PLANT AND SHIFT MANAGERS ABOUT THE AMOUNT OF MONEY SPENT BY THIS PLANT ON LOAD LOCKS AND IF THAT COST WAS PROPERLY BILLED OUT. EACH TIME SHE WAS ASKED, SHE REPLIED THAT IT WAS BEING DONE.  THIS PLANT HAS SPENT $4,024 ON LOAD LOCKS THIS FISCAL YEAR THAT HAVE NOT BEEN RECOVERED.  ALL ITEMS THAT ARE BILLED OUT MUST HAVE A PRODUCT CODE.   THIS INCLUDES PLASTIC PALLETS AND LOAD LOCKS.  MELISHA IS DIRECTLY AND SOLELY RESPONSIBLE FOR THIS LOSS OF PROFIT.

AS OF THIS DATE, THERE WILL BE NO MORE WRITTEN COUNSELING STATEMENTS CONCERNING JOB PERFORMANCE.  THIS DOCUMENT IS TO SERVE AS YOUR FINAL WRITTEN WARNING.  ANY OTHER DISCIPLINARY ACTION THAT IS WARRANTED WITHIN THE NEXT SIX (6) MONTHS WILL RESULT IN TERMINATION.  IT IS NOW TIME TO DEMONSTRATE YOUR COMMITMENT TO BE A PRODUCTIVE AND POSITIVE MEMBER OF THE HEFLIN TEAM.

TO:  MELISHA HEARD, SHIPPING SUPERVISOR

FROM:  JOHN CHAPMAN, SHIFT MANAGER

DATE:  JUNE 12, 1997



DEFENDANT'S EXHIBIT

// Heard 5-7-99

THE FOLLOWING INCIDENTS HAVE RECENTLY OCCURRED WHICH ARE UNACCEPTABLE:

ON JUNE 11, 1997 THE PLANT QUALITY ASSURANCE MANAGER NOTIFIED ME THAT THERE WAS A TRAILER ON THE SHIPPING DOCK DOOR THAT HAD A FOUL ODOR. THIS ODOR WAS DETECTABLE IN SECOND PROCESSING AND WAS STRONG ON THE SHIPPING DOCK AND SHIPPING OFFICE. UPON INVESTIGATION, THE TRAILER WAS FOUND TO HAVE WATER AND SLIME RUNNING FROM BENEATH THE BED. I INSTRUCTED MELISHA TO REMOVE THE TRAILER FROM THE DOOR IMMEDIATELY. SHE ASKED ME WHAT TO DO WITH THE PRODUCT THAT HAD ALREADY BEEN LOADED. I FOUND IT INCREDIBLE THAT ANYONE WOULD LOAD FOOD PRODUCT ONTO A TRAILER IN THIS CONDITION. I THEN INSTRUCTED MELISHA TO IMMEDIATELY UNLOAD THE PRODUCT FROM THE TRAILER AND THEN PULL THE TRAILER FROM THE DOOR. I ASKED MELISHA HOW LONG THE TRAILER HAD BEEN ON THE SHIPPING DOCK. SHE STATED THAT IT HAD BEEN LOADED BY NIGHT SHIFT PERSONNEL. IT IS INCOMPREHENSIBLE TO ME THAT MELISHA HAD NOT INVESTIGATED THE SOURCE OF THIS ALMOST OVERPOWERING STENCH IMMEDIATELY UPON HER ARRIVAL AT 7:00 A.M. THE FACT THAT HER SHIPPING PERSONNEL LOADED A TRAILER IN THIS CONDITION DEMONSTRATES THAT THEY HAVE NOT BEEN PROPERLY TRAINED BY HER.

ON JUNE 12, 1997 AT APPROXIMATELY 10:00 A.M. USDA PERSONNEL NOTIFIED ME THAT A TRAILER ON THE SHIPPING DOCK WAS HOT AND ASKED WHY THE UNIT WAS NOT RUNNING. I EXPLAINED THAT THE TRAILERS WERE PRECOOLED PRIOR TO LOADING AND THAT THE UNITS WERE SHUT OFF DURING LOADING PER COMPANY DIRECTIVE. THE TRAILER WAS FOUND TO BE PARTIALLY LOADED AND THE AMBIENT TEMPERATURE WAS 67 DEGREES F AND THE PRODUCT TEMPERATURE WAS 42 DEGREES F. ANOTHER TRAILER, EMPTY AND AWAITING LOADING, WAS ON THE ADJACENT DOCK DOOR AND THE AMBIENT TEMPERATURE WAS 71 DEGREES F. MELISHA INFORMED ME THAT BOTH TRAILERS HAD BEEN ON THE DOCK DOOR WITH THE DOORS OPEN SINCE AT LEAST 7:00 A.M. WHILE ALL THIS WAS TRANSPIRING A USDA INSPECTOR FOUND THAT TWO PALLETS OF PLASTIC PALLETS WERE ON THE SHIPPING DOCK WERE UNWASHED AND COVERED WITH PIECES OF FAT AND MEAT.

THE FOLLOWING JOB PERFORMANCE REQUIREMENTS ARE QUOTED VERBATIM FROM A COUNSELING STATEMENT GIVEN TO YOU ON 1-31-97:

"MAINTAIN THE COOLER, SHIPPING DOCK AND DOCK EXTERIOR IN A CLEAN AND SANITARY MANNER AT ALL TIMES."

"MONITCR THE AMBIENT COOLER AND TRUCK TEMPERATURES SO THAT OUR PRODUCT IS HELD AND TRANSPORTED WITH MINIMAL RISK OF SPOILAGE."

"TRAILER SHOULD BE PRE-COOLED PRIOR TO LOADING. THE UNITS SHOULD BE CUT OFF WHEN THE DOOR IS UP TO PREVENT THEM FROM FREEZING."

IN A COUNSELING STATEMENT REGARDING JOB PERFORMANCE THAT YOU WERE GIVEN ON 5-16-97, YOU WERE INFORMED THAT THERE WILL BE NO MORE WRITTEN COUNSELING STATEMENTS CONCERNING JOB PERFORMANCE.   THAT DOCUMENT SERVED AS YOUR FINAL WRITTEN WARNING AND STATED THAT ANOTHER DISCIPLINARY ACTION WITHIN THE FOLLOWING SIX MONTH PERIOD WOULD RESULT IN TERMINATION.  EFFECTIVE FRIDAY, JUNE 13, 1997, YOUR EMPLOYMENT WITH TYSON FOODS, INC. IS TERMINATED.

John C Clepra
6-12-97

Bob Massaro
Plant Personnel Mgr
12 JUN 97

PAGE 2 OF 2

Refused to Sign
JC
Witnessed By:
Bob Massaro

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Birmingham District Office

1900 3rd Avenue, North, Suite 101
Birmingham, AL 35203-2397
PH: (205) 731-1359
TDD: (205) 731-0175
FAX: (205) 731-2101

Melisha E. Heard
131 Ervin Circle
Heflin, AL 36264

REF:      Charge No. 130 98 1016 - Melisha E. Heard v. Tyson Foods, Inc.

Dear Ms. Heard:

Based on my analysis of the material and testimony which you presented previously, and
information secured from other sources, I have concluded that it is unlikely that additional
investigation would result in a finding that the law was violated, as you alleged in the above
referenced charge. I have arrived at this conclusion because:

The evidence reveals that you were discharged because of unsatisfactory performance after
receiving counseling statements regarding your performance. The evidence reveals that blacks and
whites who exhibted similar conduct were treated in the same manner.

If you have additional information or evidence which was not submitted previously, please
forward same to my attention, or call me at (205) 731-0178. Consideration will be given to any
additional information you submit.

Enclosed with this letter is your Dismissal and Notice of Rights. The Notice of Rights provides
you with the opportunity to pursue your case in Federal district court, should you disagree with
EEOC's determination. Should you decide to pursue your case in federal court, you must do so
within 90 days from the date on the Dismissal and Notice of Rights.

Sincerely,

Glenda Bryan Brooks
Investigator

7-2-98
Date

DEFENDANT'S
EXHIBIT
12  Heard
5-7-99

Equal Employment Opportunity Commission

## DISMISSAL AND NOTICE OF RIGHTS

| To: Melisha E. Heard<br>131 Ervin Circle<br>Heflin, AL 36264 | From:<br>**BIRMINGHAM DISTRICT OFFICE**<br>**1900 THIRD AVENUE NORTH**<br>**BIRMINGHAM, AL  35203** |
|---|---|

[  ]  *On behalf of a person aggrieved whose identity is*
*CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No.<br>. 130 98 1016 | EEOC Representative<br>Glenda B. Brooks, Investigator | Telephone No.<br>**(205) 731-0178** |
|---|---|---|

*(See the additional information attached to this form.)*

YOUR CHARGE IS DISMISSED FOR THE FOLLOWING REASON:

[  ]  The facts you allege fail to state a claim under any of the statutes enforced by the Commission

[  ]  Respondent employs less than the required number of employees.

[  ]  Your charge was not timely filed with the Commission, *i.e.*, you waited too long after the date(s) of the discrimination you alleged to file your charge.  Because it was filed outside the time limit prescribed by law, the Commission cannot investigate your allegations.

[  ]  You failed to provide requested information, failed or refused to appear or to be available for necessary interviews/conferences, or otherwise refused to cooperate to the extent that the Commission has been unable to resolve your charge.  You have had more than 30 days in which to respond to our final written request.

[  ]  The Commission has made reasonable efforts to locate you and has been unable to do so.  You have had at least 30 days in which to respond to a notice sent to your last known address.

[  ]  The respondent has made a reasonable settlement offer which affords full relief for the harm you alleged.  At least 30 days have expired since you received actual notice of this settlement offer.

[ X ]  The Commission issues the following determination: Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[  ]  Other (*briefly state*) _____

### - NOTICE OF SUIT RIGHTS -

[ X ]  **Title VII and/or the Americans with Disabilities Act:** This is your NOTICE OF RIGHT TO SUE, which terminates the Commission's processing of your charge.  If you want to pursue your charge further, you have the right to sue the respondent(s) named in your charge in U.S. District Court.  **If you decide to sue, you must sue WITHIN 90 DAYS from your receipt of this Notice; otherwise your right to sue is lost.**

[  ]  **Age discrimination in Employment Act:** This is your NOTICE OF DISMISSAL OR TERMINATION, which terminates processing of your charge.  If you want to pursue your charge further, you have the right to sue the respondent(s) named in your charge in U.S. District Court.  If you decide to sue, you must sue **WITHIN 90 DAYS** from your receipt of this Notice; otherwise your right to sue is lost.

[  ]  **Equal Pay Act (EPA):** EPA suits must be brought within 2 years (3 years for willful violations) of the alleged EPA underpayment.

 certify that this notice was mailed on the date set out below.

7-2-98
*(Date Mailed)*

On behalf of the Commission

Donald P. Burris, District Director (Acting)

ures
formation Sheet
opy of Charge
spondent(s)

EEOC Form 161 (Test 5/95)